IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 19, 2016

## STATE OF TENNESSEE v. TIMOTHY ALLEN JOHNSON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2014-B-1187     Cheryl Blackburn, Judge**

------

**No. M2015-01160-CCA-R3-CD – Filed June 15, 2016**

------

A Davidson County jury convicted the Defendant, Timothy Allen Johnson, of sale of less than .5 grams of cocaine in a drug-free school zone. On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction. After a thorough review of the record and applicable authorities, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Nicholas McGregor (at trial) and David Harris (on appeal), Nashville, Tennessee, for the appellant, Timothy Allen Johnson.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Glenn S. Funk, District Attorney General; Jeff Burks, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Facts
### A. Trial

This case arises from an undercover drug purchase in the Edgehill neighborhood of Nashville, Tennessee, on March 27, 2012. A Davidson County grand jury indicted the Defendant for sale of less than .5 grams of cocaine in a drug-free school zone and delivery of less than .5 grams of cocaine in a drug-free school zone. The following evidence was

1

presented at the Defendant's trial: Detective Michael Donaldson, a Metropolitan Nashville police officer, testified that he worked in an "undercover capacity" buying and selling drugs on the streets. On March 27, 2012, Detective Donaldson was assigned to the Crime Suppression Unit and was buying drugs from street level drug sellers. He received a list of citizen complaints about where drugs were being sold on the street. Detective Donaldson went to one area of complaint, at the corner of Wedgewood Avenue and Waverly Avenue in the Edgehill neighborhood. Detective Donaldson parked his vehicle at the intersection and began walking around the area. He saw a woman and two men standing by a tree, and as the woman walked away from the men, Detective Donaldson asked her if she knew where he could buy drugs. The woman turned around and pointed to the two men, and Detective Donaldson approached them, one of whom he identified as the Defendant. Detective Donaldson asked the Defendant in "street lingo" if he could buy $30 worth of crack cocaine from him. The Defendant replied that he did not have "any, he was waiting to get his and that [Detective Donaldson] would have to come back."

Detective Donaldson walked away from the Defendant and then advised his partner that he needed to wait for the Defendant to get the drugs. Detective Donaldson subsequently went back over to the Defendant and asked if the Defendant had gotten the drugs yet, to which he replied that he had not. The Defendant told Detective Donaldson that he would "get it from another place." The Defendant walked across Wedgewood Avenue and directed Detective Donaldson to follow him. Once across the street, the Defendant knocked on the door of a house, and someone opened the door. The Defendant spoke to that person and then walked back over to Detective Donaldson and said that he could not get any drugs from the person inside the house but that the Defendant knew another place to try. The Defendant and Detective Donaldson got into Detective Donaldson's undercover vehicle, driven by Detective Donaldson's partner, and drove to a nearby Shell gas station, located at the intersection of Lafayette Street and Lewis Street. Detective Donaldson testified that the gas station was close to Johnson Elementary School.

Once at the Shell station, Detective Donaldson gave the Defendant previously photocopied "buy money," and the Defendant exited the vehicle to get the drugs. The Defendant walked across Lewis Street and into a housing division; Detective Donaldson indicated the Defendant's route on a map displayed for the jury. He recalled that it was 9:15 or 9:30 p.m. Detective Donaldson clarified that the Defendant exited the vehicle with the buy money and disappeared from view, and neither Detective Donaldson nor his partner followed the Defendant. Approximately five minutes later, the Defendant returned to the vehicle and appeared nervous because uniformed police officers were on foot patrol close by. Detective Donaldson stated that the uniformed officers had no knowledge of the undercover operation. The Defendant got into the vehicle and said, "Let's go." Detective Donaldson asked for the drugs or his money back. The Defendant insisted that they drive away. As

2

Detective Donaldson drove the vehicle away from the gas station, the Defendant showed him a large bag. The bag was "a much larger bag than you would get for $30 worth of cocaine" and Detective Donaldson asked if "all of it" was for him. The Defendant said, "no, the rest of it is mine." The Defendant untied the bag and "broke off a piece [of crack cocaine] the size of a pencil eraser and handed [Detective Donaldson] that piece. . . ." Detective Donaldson stated that the Defendant gave the drugs to him "approximately a block" from the Shell gas station at Worth Street. Detective Donaldson then secured the sold crack cocaine, completing the transaction, and gave the "takedown signal" to nearby police officers. Detective Donaldson continued to engage the Defendant in conversation hoping to distract him.

Uniformed officers responded to the takedown signal, and the Defendant started to eat the remaining drugs in the bag. Detective Donaldson wrestled with the Defendant in an attempt to stop him from eating all the remaining drugs but was unable to stop the Defendant from swallowing them. However, Detective Donaldson still had the piece of crack cocaine he had purchased from the Defendant. Officer Bill Loucks then attempted to remove the Defendant from the vehicle, and the Defendant punched and kicked him to avoid being handcuffed. "After considerable wrestling and fighting," the Defendant was detained, at which point Detective Donaldson exited his vehicle and conducted a field test on the drugs purchased from the Defendant. The drugs tested positive for cocaine base and were placed in an evidence bag. Detective Donaldson identified in court the drugs in the evidence bag.

Detective Donaldson again identified on a map where the Shell gas station was located. He stated that the Police Department had done "numerous" undercover drug purchases at "this location" and had determined that it was located in a "drug free school zone." Detective Donaldson recalled that the Defendant, when he returned to the vehicle with drugs, did not have the buy money on his person, as determined by a search of his person after he was detained. The buy money was not recovered.

On cross-examination, Detective Donaldson clarified that the complaint about drug activity did not identify the Defendant but simply an address at an intersection. He agreed that he was not investigating the Defendant in particular. Detective Donaldson stated that he stayed in the vehicle at the Shell station, instead of following the Defendant into the housing division, and he did not see the Defendant acquire the drugs.

Detective Brittany Shoesmith testified that she worked for the Metropolitan Nashville Police Department and was partnered with Detective Donaldson on March 27, 2012, working in an undercover capacity. Detective Shoesmith drove the undercover vehicle with Detective Donaldson as a passenger to the Edgehill neighborhood. She recalled that Detective Donaldson got out of the vehicle and came back a short while later to report that he had met

an individual to buy drugs from but that the individual needed to get more drugs from his supplier. After several attempts to find drugs, the Defendant and Detective Donaldson both got into the vehicle and the three of them drove to the Shell gas station on Lafayette Street where the Defendant said he would meet with his supplier and get more drugs. At the gas station, the Defendant exited the vehicle and was gone for no more than ten minutes. When he returned, he got back into the vehicle and told Detective Shoesmith to drive away. Detective Shoesmith began driving the vehicle on Lafayette Street towards downtown. The Defendant pulled out a plastic bag containing what Detective Shoesmith described as crack cocaine. The Defendant "broke off a piece and gave it to Detective Donaldson." The "takedown word" was then given and Detective Shoesmith stopped the vehicle on Lafayette Street and the Defendant was taken into custody.

On cross-examination, Detective Shoesmith clarified that she stopped the vehicle after Detective Donaldson had received the drugs from the Defendant. She agreed that she swore out arrest warrants in this case. She could not recall the address written on the warrants or exactly where the vehicle stopped. Detective Shoesmith agreed that if the warrants listed 1035 1st Avenue North, that was an accurate address for where she stopped the vehicle.

Detective Bill Loucks testified that he was working on the narcotics unit on March 27, 2012, and that he provided "cover" for the undercover officers and monitored their interactions. Once the takedown signal was given, Detective Loucks stopped the vehicle driven by Detective Shoesmith and took the seller, the Defendant, into custody. He was not involved in the drug transaction until the takedown signal was given.

Special Agent Denotria Patterson testified that she worked for the Tennessee Bureau of Investigation ("TBI") as a forensic scientist. Agent Patterson was admitted as an expert in the field of forensic chemistry. Agent Patterson tested the drugs that the Defendant sold to Detective Donaldson in the TBI laboratory. She stated that the drugs tested positive for cocaine base and weighed .20 grams. She testified that cocaine was a Schedule II substance.

David Kline testified that he worked at the Metropolitan Nashville Planning Department. Mr. Kline identified on a map the intersection of Lafayette Street and Lewis Street, where the Shell gas station was located; the map was admitted into evidence. He also identified the property lines for Napier School and a 1,000 foot "buffer" zone around the school. He testified that the Shell gas station at the intersection of Lafayette Street and Lewis Street was within the 1,000 foot buffer zone surrounding Napier School.

On cross-examination, Mr. Kline stated that 1st Avenue North was also called Hermitage Avenue. He indicated where the street was on the map but could not identify the specific location of 1035 1st Avenue North.

4

Based upon this evidence the jury convicted the Defendant of sale of less than .5 grams of cocaine within a drug-free school zone. The jury foreperson stated that the jury had not deliberated as to the delivery of less than .5 grams of cocaine within a drug-free school zone charge; the charge was dismissed.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction. He contends that the drug transaction took place outside of the drug free school zone and that Mr. Kline only testified that the Shell gas station at the intersection of Lafayette Street and Lewis Street was inside the 1,000 foot buffer. He contends that the evidence shows that the transaction took place once Detective Shoesmith drove the undercover vehicle away from the gas station to 1035 1st Avenue North, outside the 1,000 foot drug free zone. The State responds that the Defendant took money from Detective Donaldson at the Shell gas station, within the school zone and returned to the same location with the drugs, completing the sale, and then delivered the drugs on the "outer limits" of the school zone. The State contends that this is more than sufficient to establish that the Defendant sold drugs in a school zone. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Tennessee Code Annotated provides that it is an offense for a person to knowingly sell a controlled substance. T.C.A. § 39-17-417(a)(3) (2014). Cocaine is a Schedule II controlled substance. T.C.A. § 39-17-408. Knowingly is defined as when a person acts "with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-302(b). "[A] sale consists of two components: a bargained-for offer and acceptance, and an actual or constructive transfer or delivery of the subject matter property." *State v. Holston*, 94 S.W.3d 507, 510 (Tenn. Crim. App. 2002) (citing *State v. Wilkerson*, No. 03C01-9708-CR-00336, 1998 WL 379980 (Tenn. Crim. App. at Knoxville, July 9, 1998)). "One who accepts payment in exchange for property is involved in a sale." *Id.* at 511 (citations omitted). "A violation of § 39-17-417, or a conspiracy to violate the section, that occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school, secondary school, preschool, child care agency, or public library, recreational center or park shall be punished one (1)

classification higher than is provided in § 39-17-417(b)-(i) for such violation." T.C.A. § 39-17-432(b)(1). In essence, the statute creates a "buffer zone" of one thousand feet around schools. *Id.*

We conclude that the evidence presented, viewed in the light most favorable to the State, is sufficient to establish that the Defendant knowingly sold a Schedule II controlled substance to an undercover officer within 1,000 feet of a school. The Defendant and an undercover officer had a conversation at an Edgehill neighborhood intersection, during which the officer indicated he wanted to buy cocaine. The Defendant said he knew where to get it and took the officer to the location, a Shell gas station. Once there, the Defendant took the officer's money, went away with the money and returned with a white substance from which he broke off a small piece and gave it to the detective. The Defendant ingested the majority of this substance after police officers stopped the men, but the white substance in the detective's possession was later identified as crack cocaine, weighing .20 grams. An employee of the Metropolitan Planning Department testified that the location where the exchange of money took place was within 1,000 feet of a school. The Defendant gave Detective Donaldson the drugs when the undercover vehicle was one block away from the gas station. A jury could reasonably infer from this evidence that the sale of the drugs took place within the drug-free school zone. Accordingly, we conclude that there was sufficient evidence to support the jury's finding that the Defendant was guilty beyond a reasonable doubt of sale of a Schedule II controlled substance within 1,000 feet of a school. The Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

7